UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


VALERIYA HUGHES,

                Plaintiff,              CASE NO. 17-10436
                                      HON. DENISE PAGE HOOD
v.

HENRY FORD HEALTH SYSTEM,

                Defendant.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [#17]

## I.      BACKGROUND

### A. Procedural Background

On February 10, 2017, Plaintiff Valeriya Hughes ("Hughes") brought this action against Defendant Henry Ford Health System ("HFHS"), alleging Defendant violated Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and the Elliott-Larsen Civil Rights Act (ELCRA), MCL § 37.2202 *et seq.* (Counts I and II), the American with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.* (Count III), the Michigan Persons with Disabilities Civil Rights Act (PWDCRA), MCL § 37.1101 *et seq.* (Count IV), and the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601 (Count V). (Doc #1)  Hughes seeks compensatory, exemplary and punitive

damages, among other relief.  *Id.*  Defendant filed an Answer to the Complaint on March 21, 2017.  (Doc # 5)

This matter is before the Court on Defendant's Motion for Summary Judgment, filed on February 27, 2018.  (Doc # 17)  Plaintiff filed a Response on March 27, 2018.  (Doc # 20)  On April 9, 2018, Defendant filed a Reply.  (Doc # 21)

Hughes brings claims against HFHS for racial discrimination and retaliation, disability discrimination and retaliation, and violations of the Family and Medical Leave Act.  (Doc # 1)  Hughes argues that she has only circumstantial evidence of discrimination on the basis of her disability and race, but contends she has direct evidence to support her retaliation claim under the FMLA and for her disability retaliation claim.  (Doc # 20, Pg. 19–20)  HFHS argues that Hughes has neither direct nor circumstantial evidence of discrimination or retaliatory motive to support any of her claims.  (Doc # 17, Pg. 16–21)  For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**.

## B. Factual Background

Hughes is a disabled African-American woman who began working as a Medical Assistant (MA) for HFHS in 2006.  (Doc # 20, Pg. 4)  On December 23, 2007, Hughes started working at Employee Health Services' Macomb Clinic ("Macomb EHS"), a department at Henry Ford Macomb Hospital in Clinton Township, Michigan.  (*Id.* at 5)  An HFHS Medical Assistant works under the

supervision of a registered nurse or physician. (Doc # 17, Pg. 6) Hughes became a full-time HFHS MA in May 2008. (*Id*.) The Parties agree that Hughes's skills as a MA were satisfactory, but Hughes had issues with co-workers and customers.

Hughes developed chronic migraines in 2007. (Doc # 20, Pg. 5) Hughes applied for FMLA status in 2010. (*Id.*) Hughes was granted intermittent leave under the FMLA as of June 1, 2010. (*Id.*) She was also diagnosed with fibromyalgia in 2012. (*Id.*) Hughes was granted intermittent leave under the FMLA as of December 2, 2011; December 7, 2012; June 12, 2014; June 9, 2015; and December 9, 2015. (*Id.* at 5, n.1)

Betty Kuschel–Rapaski ("Rapaski") became Hughes's department manager in 2011. Rapaski expressed frustration with Hughes's intermittent leave. (*Id.* at 5) Hughes alleges that Rapaski considered Hughes's occasional intermittent leave a "hardship" on the Macomb EHS department. Rapaski told Eric Bacigal ("Bacigal")—Rapaski's supervisor—that Hughes used FMLA "inevitably", "when it wasn't planned", that "[Hughes's leave] would make managing that day very difficult", and that it was frustrating "because [Rapaski] would have to scramble." (*Id.* at 6) Rapaski also expressed her frustrations to Christine Evans, HFHS's Consultant for Compliance, Employee Relations and Workforce Diversity. (*Id.*)

Hughes asserts:

(1) Rapaski maintained a calendar documenting Hughes's time taken off, that could be seen by the employees in the Macomb EHS department;

(2) Hughes overheard Rapaski discuss Hughes's FMLA status with other individuals, suggested that Hughes was faking her symptoms, and was lazy;

(3) Hughes's co-workers told Hughes that Rapaski made comments about her FMLA status when Hughes was not present;

(4) Rapaski asked employees in the department to spy on Hughes and monitor when she left and returned from lunch.

(5) Rapaski once told Hughes to "shut up";

(Doc # 20, Pg. 7)  Hughes contends that Rapaski's sentiments created an environment where other employees felt they had a license to discuss Hughes's medical issues.  (Doc # 20, Pg. 8)

In March 2014, Rapaski issued Hughes a formal corrective action because she considered Hughes's response to an inquiry about Hughes's clock-in time insubordinate.  (Doc # 17, Pg. 8)  Rapaski reported that Hughes raised her voice in response, and slammed an office door as she left the meeting between the two.  (*Id.*)

On August 26, 2015, Hughes learned that three of her co-workers told student nurses about Hughes's medical issues and informed the students that wearing heavy fragrances or smelling like cigarette smoke might cause Hughes to have migraines

and go home sick.  (Doc # 20, Pg. 9)  Later that day, Hughes reported the incident

to Bacigal.  Bacigal referred the matter to Keith Harris, a manager HFHS employee

in Health Services.  (*Id.*)  Harris's investigation into the matter confirmed Hughes's

account of the events.  (*Id.*)

On October 22, 2015, Rapaski gave Hughes a documented "coaching" to help

Hughes with her interpersonal skills following co-worker and customer survey

complaints referencing rude patient treatment by Hughes.  (Doc # 17, Pg. 8)  Hughes

was assigned to the Service Excellent Assessment and Training Program (SEAT) on

November 10, 2015 to improve her customer service.  (Doc # 17, Pg. 9; Doc # 20,

Pg. 10)  Hughes asserts that she told SEAT Director Pam Theisen ("Theisen") that

Hughes was being treated differently by Rapaski because of her race and the August

26, 2015 report.  (Doc 20, Pg. 10)  HFHS did not investigate Hughes's report to

Theisen.  (*Id.*)  The SEAT program report on Hughes opines, in part, that Hughes

has no insight into her own tendencies with co-workers and customers and, weak

acknowledgment of a need or want to change.  (Doc # 17, Pg. 9)

On December 2, 2015, Hughes filed a Charge of Discrimination for race and

disability discrimination and retaliation with the Equal Employment Opportunity

Commission (EEOC).  (Doc # 20, Pg. 10)  On December 17, 2015, Michelle

Cunningham ("Cunningham"), Hughes's co-worker, complained to Bacigal about

racial and disability discrimination directed at her co-workers.  (*Id.*)

On January 21, 2016, Hughes sent Bacigal an email complaining that Rapaski asked MA Jon Nigro if his contemplated transfer was caused by Hughes. The email also complained that Rapaski singled out Hughes by asking other HFHS employees to track when Hughes left and when she returned, turning HFHS employees against her, keeping a calendar of Hughes's days off, and asking Hughes to comment on black job applicants. (Doc # 17, Pg. 9) Bacigal referred the complaint to Jan Harrington-Davis, Director of Employee Labor Relations, Workforce Diversity, and Compliance ("Harrington-Davis"), and Christine Evans, system-wide diversity consultant ("Evans"). (*Id.*) Harrington-Davis instructed Evans to investigate Hughes's complaints. (*Id.*)

Evans interviewed Hughes and ten other people. (*Id.* at 10) The investigation revealed other information. Employees Desmond Thompson and John Nigro complained about Hughes and Cunningham. (*Id.*) Hughes and Cunningham complained about Thompson and Nigro. (*Id.*) Rapaski informed Evans that Hughes told HFHS employees that Rapaski was "a drunk, is smoking and is abused by her husband." (*Id.*) Hughes admits that she made those remarks about Rapaksi. (*Id.*)

Based on Evans's recommendation, HFHS conducted a departmental climate assessment. (Doc # 20, Pg. 11; Doc # 17, Pg. 10) Evans interviewed other HFHS employees, former employees, and produced a report on the department. (Doc # 17, Pg. 10) The report concluded that there were substantial problems with the Macomb

EHS department.  Evans concluded that Rapaski was not a good leader, and that the Macomb EHS department was a "toxic" environment.  (*Id.*)  The toxicity was found to be the result of a "culmination of circumstances" attributable to the entire staff. (Doc # 20, Pg. 13)  Evans found that, at times, Rapaski did not show Hughes the same respect she displayed for other employees in the Macomb EHS department. (Doc # 20, Pg. 12)  Evans also concluded that several of Hughes's co-workers had the perception that Rapaski's tone and body language was noticeably different when addressing Hughes, and that there were times that Rapaski did not speak to Hughes when speaking to others in the room.  (*Id.*)  Evans recommended that Rapaski have a "documented coaching" and be required to attend leadership courses.  (*Id.*)

On March 22, 2016, HFHS developed a plan to disband the Macomb EHS department.  (Doc # 20, Pg. 13; Doc # 17, Pg. 11)  The plan called for the department to be reconstituted with new employees, except the employees on the professional staff.  (Doc # 17, Pg. 11)  Julia Ostrowski, an older Caucasian woman who did not get along with Hughes, was fired prior to the development of the plan for poor customer service.  (*Id.*)  The plan also called for the firing of Rapaski, also a Caucasian woman, with no progressive discipline, performance improvement plan, ability to transfer, or severance package.  (*Id.*)  Rapaski was required to apologize to her staff for her poor leadership, then she was assigned to the HFHS hospital at West Bloomfield before submitting her resignation two weeks later.  Bacigal and Evans

informed the rest of the Macomb EHS staff that the department was being disbanded. (*Id.*)  After the disbanding of the department, Hughes and Cunningham were the only two non-professional employees remaining in the Macomb EHS department.  (Doc # 17, Pg. 11–12)  Hughes and Cunningham were to be transferred to another department.  (*Id.*)

On March 29, 2016, Bacigal and Jan Harrington-Davis, HFHS Director of Employee Relations and Diversity, met jointly with Hughes and Cunningham to discuss Evans's report on the Macomb EHS department.  (Doc # 20, Pg. 14)  Bacigal informed them they would no longer be allowed to work in the department. Harrington-Davis added that they would be transferred to another department to get a "fresh start" and this action was "nothing personally against [them]."  (*Id.*) Harrington-Davis also confirmed that the step was not a corrective action.  (*Id.*)

In April 2016, Hughes and Cunningham met with Bacigal and Harrington-Davis to discuss the conditions of transfer.  (Doc # 17, Pg. 12)  Defendant asserts that Harrington-Davis informed Hughes and Cunningham that if any complaints of inappropriate behavior against either of them was confirmed from the date of the meeting onward, the offender would be terminated.  (Doc # 17, Pg. 12)  Hughes denies that Harrington-Davis gave them such a warning.  (Doc # 20, Pg. 14)  Hughes was later offered a position with the HFHS Family Medical Group on April 25, 2016. (Doc # 20, Pg. 16)  Hughes accepted the position.  (*Id.*)

Sometime after the meeting with Bacigal and Harrington-Davis, Hughes and Cunningham began staffing the Macomb EHS department under the supervision of interim manager Deborah Allen, contract staff MA, Takisha McCray, and professional nurse Practitioner Danielle Glenn. (Doc # 17, Pg. 12) During that time, Hughes and Cunningham "traveled" to the endoscopy department at the HFHS Macomb Hospital to provide onsite services, such as surgical mask fit testing. (*Id.*)

On May 3, 2016, while Hughes and Cunningham were doing surgical mask fit testing, Sheri King ("King"), an HFHS employee in the endoscopy department for twenty-five years, received complaints from at least ten members of her department alleging that Hughes and Cunningham were rude and not nice. (Doc # 17, Pg. 13) Christine Gelmini ("Gelmini"), one of King's subordinates, complained about Hughes's care. King asked Gelmini to send her an email to remind her of the complaint. (*Id.*) At 2:35 p.m. on May 3, 2016, Gelmini sent King an email expressing her concerns that Hughes wanted to cut off patient flow at 10:30 a.m. because Hughes wanted to go to lunch, and criticized Hughes's attitude about the fitting of the patient's surgical mask. (*Id.*) Hughes allegedly told Gelmini it was not Hughes's problem. (*Id.*) Gelmini also took offense to the way Hughes allegedly treated her after being informed of Gelmini's head injury. (*Id.*)

King forwarded Gelmini's email to HFHS Macomb Human Resources Vice President Noel Baril ("Baril"). (*Id.*) In the email, King described Hughes as a

"young black nurse", and did not mention Cunningham. (Doc # 20, Pg. 18)  Baril forwarded the email to Bacigal, who then forwarded it to Evans and Harrington-Davis with the note that he was "getting a bit uncomfortable transferring folks that are behaving in this way." (*Id.*)  Bacigal also noted a complaint from another patient, Judith McKenna, which involved Hughes and Cunningham's treatment of MA Takisha McCray. (*Id.*)  Hughes argues that Judith McKenna's complaint only references the "receptionist" (Cunningham) and does not critique Hughes.

Harrington-Davis instructed Bacigal to conduct an investigation. (Doc # 17, Pg. 14)  Bacigal spoke with King and McCray, and had correspondence with McKenna. (*Id.*)  Bacigal also spoke with interim manager Deborah Allen, who reported that Hughes took time off to attend a transfer job interview. (*Id.*)  Hughes contends that she interviewed for an HFHS coordinator position after receiving permission from both Deborah Allen and Evans. (Doc #20, Pg. 19)  Bacigal also spoke with Hughes, who denied being rude or knowing that Gelmini has a head injury. (Doc # 17, Pg. 14)  King contradicted Hughes's statements. (*Id.*)  Following the investigation, Hughes and Cunningham were terminated by HFHS on May 13, 2016. (Doc # 20, Pg. 19; Doc # 17, Pg. 14)

## II.    ANALYSIS

### A.  Standard of Review

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). A fact is material if it could affect the outcome of the case based on the governing substantive law. *Id.* at 248. A dispute about a material fact is genuine if, on review of the evidence, a reasonable jury could find in favor of the nonmoving party. *Id.*

The moving party bears the initial burden to demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant meets this burden, the nonmoving party must "go beyond the pleadings and … designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. The Court may grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *See Muncie Power Prods., Inc. v. United Tech. Auto., Inc.*, 328 F.3d 870, 873 (6th Cir. 2003). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. "Conclusory allegations do not create a

genuine issue of material fact which precludes summary judgment." *Johari v. Big Easy Restaurants, Inc.*, 78 F. App'x 546, 548 (6th Cir. 2003).

When reviewing a summary judgment motion, the Court must view the evidence and all inferences drawn from it in the light most favorable to the nonmoving party. *Kochins v. Linden-Alimak, Inc.*, 799 F.2d 1128, 1133 (6th Cir. 1986). The Court "need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court's function at the summary judgment stage "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[A]ny direct evidence offered by the plaintiff in response to a summary judgment motion must be accepted as true." *Rorrer v. City of Stow*, 743 F.3d 1025, 1038 (6th Cir. 2014) (quoting *Muhammad v. Close,* 379 F.3d 413, 416 (6th Cir.2004)).

## B. ADA and PWDCRA (Counts III and IV)

### 1. *Discrimination Claims*

The ADA provides that

> [n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Hughes argues that she has circumstantial evidence to support her disability discrimination claim. An employee may prove disability discrimination using the familiar burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973): "the employee has the initial burden of establishing his *prima facie* case; if he does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions; finally, the employee has the burden of rebutting the employer's proffered reasons by showing them to be pretextual." *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 427, 433 (6th Cir. 2014).

To make out a *prima facie* case under the ADA, the plaintiff must establish, by a preponderance of the evidence that: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. *Id.* at 433. The plaintiff's disability must be a "but for" cause of the adverse employment action. *Id.* The parties agree that Hughes is disabled within the meaning of the ADA.

Defendant argues that Hughes cannot establish a *prima facie* case for disability discrimination under the ADA or the PWDCRA because she has no evidence HFHS's reasons for discharging her were related to her disability. HFHS contends that Hughes cannot establish that HFHS's stated reasons for her

termination were pretext for unlawful disability discrimination.  (Doc # 17, Pg. 19)

Hughes argues that the stated reasons for her termination were pretext based on

HFHS's failure to follow the normal progressive discipline policy, the bias of

Bacigal's investigation, and that comparable employees were treated more favorable

than her.  (Doc # 20, Pg. 21–28)

Although Hughes's argument conflates the causation requirement of a proper

ADA or PWDCRA discrimination claim with pretext analysis, the Court finds that

Hughes's disability discrimination claim fails because she cannot show that HFHS

reasons for her termination were pretext.  An employee bringing an ADA claim can

show pretext by offering evidence that an employer's stated reason for termination

(1) had no basis in fact, (2) did not actually motivate its decision, or (3) was never

used in the past to discharge an employee.  *Smith v. Chrysler Corp.*, 155 F.3d 799,

806 (6th Cir. 1998) (citing *Kocsis v. Multi–Care Management, Inc.*, 97 F.3d 876,

883 (6th Cir.1996)).

HFHS terminated Hughes due to her poor customer service and attitude with

co-workers over a period of time.  Hughes does not dispute that she was terminated

for those reasons.  Hughes contends that other HFHS employees who were fired

were treated different because they were allowed to follow HFHS's progressive

discipline policy. Hughes's argument is unpersuasive.  Rapaski and Cunningham

were also fired abruptly for similar reasons.  Hughes has not alleged that either of

them had disabilities similar to Hughes.  Hughes has not cited any other evidence that she was discriminated against because of her disability.

With respect to Hughes's ADA and PWDCRA discrimination claims for her termination, Defendant's Motion for Summary Judgment is **GRANTED**.

## 2. *Retaliation Claim*

The ADA's retaliation provision makes it unlawful for an employer to "discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  Hughes contends to have direct evidence to support her retaliation claim.  Hughes cites to Rapaski confronting her about making a complaint while Rapaski was out of the office, and placing Hughes on corrective action and SEAT.  That evidence is not direct evidence to support a claim for retaliation for Hughes's alleged harassment by Rapaski because the formal employment actions—the corrective action and SEAT training—were taken in response to a complaint about Hughes's customer service.  Neither Rapaski, nor anyone else referenced Hughes's disabilities.  On the issue of termination, Rapaski was also fired, and played no direct role in the decision to fire Hughes.  In light of the lack of direct evidence, the Court proceeds under the burden-shifting framework used to establish retaliation claims using circumstantial evidence.

To establish a *prima facie* case of retaliation under the ADA and PWDCRA, the plaintiff must show that (1) she engaged in activity protected by the ADA; (2) the defendant knew of this exercise of plaintiff's protected rights; (3) the defendant subsequently took an employment action adverse to plaintiff or subjected the plaintiff to severe or pervasive retaliatory harassment: and (4) there was a causal connection between the protected activity and the adverse employment action. *Hurtt v. Int'l Servs., Inc.*, 627 F. App'x 414, 422 (6th Cir. 2015) (citation omitted). "The required causal connection is a 'but for' relationship." *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir.2012). "If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir.1997). The plaintiff bears the burden of proving that the defendant's "proffered reason for the action was merely a pretext for discrimination." *Id.* (citation omitted).

The issue is whether there was a causal connection between the protected activity and the adverse employment action. Plaintiff's burden is "minimal at the *prima facie* stage, requiring merely that they 'put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity.'" *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 699 (6th Cir. 2013) (citing *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000)). The evidence must,

however, be sufficient to allow for an inference that the adverse employment action would not have occurred if plaintiff had not engaged in the protected activity. *A.C. ex rel. J.C.*, 711 F.3d at 699. In short, the protected activity must have been a "but for" cause of the adverse employment action. Adopting the same rationale applied to the pretext issue regarding Hughes's ADA and PWDCRA discrimination claims, a reasonable jury could not find that Hughes's disability was a "but for" cause of her termination or the corrective action taken by HFHS. She was terminated for similar reasons as three employees from her department who did not have any noted disabilities, and she was subject to corrective action for legitimate customer service complaints that she does not dispute. Defendant's Motion for Summary Judgment regarding the ADA and PWDCRA retaliation claims is **GRANTED**.

## C. Title VII and ELCRA (Counts I and II)

### 1. *Racial Discrimination Claims*

The Sixth Circuit reviews claims of discrimination brought under the ELCRA under the same standards as claims brought under Title VII. *Idemudia v. J.P. Morgan Chase*, 434 F. App'x 495, 499 (6th Cir. 2011) (citation omitted). A plaintiff must proffer either direct or circumstantial evidence of discrimination to establish a *prima facie* case for Title VII or ELCRA national origin discrimination. Hughes offers circumstantial evidence in support of her claim.

To prove intentional discrimination using indirect or circumstantial evidence, Hughes must use the burden-shifting framework established in *McDonnell Douglas* and modified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981);[1] *Idemudia v. J.P. Morgan Chase*, 434 F. App'x, at 500.  A plaintiff first bears the 'not onerous' burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *Id.* (citations omitted). Once a plaintiff establishes a *prima facie* case, there is a presumption of discrimination. *Id.* Then the burden shifts to the defendant to rebut the presumption by providing evidence of a "legitimate, nondiscriminatory reason" for the adverse action taken. *Id.* (citation omitted). Once the defendant has provided a legitimate, nondiscriminatory explanation, the burden shifts back to the plaintiff to show that the defendant's stated reasons were pretext for discrimination. *Id.* "Throughout this burden-shifting approach, the plaintiff continues to bear the ultimate burden of proving, by a preponderance of the evidence, the intent to discriminate." *Wright v. Murray Guard, Inc.*, 455 F.3d 702, 707 (6th Cir.2006).

Hughes may establish a *prima facie* case by showing: (1) she is a member of a protected class; (2) she was terminated; (3) she was qualified for the position; and

---

[1] Hughes does not allege a mixed-motive claim pursuant to 42 U.S.C. § 2000e-2(m). *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396-402 (6th Cir. 2008) (rejecting application of the *McDonnell Douglas/Burdine* framework for single-motive claims to mixed-motive claims). Hughes argues that the stated reasons for her termination were pretext for the unlawful, discriminatory purpose.

(4) she was replaced by a person outside of a protected class or, alternatively, was treated differently than a similarly situated, non-protected employee. *Abdulnour v. Campbell Soup Supply Co., LLC*, 502 F.3d 496, 501 (6th Cir. 2007).

Defendant argues that Hughes cannot establish a *prima facie* case because she cannot show that she was replaced by a person outside of a protected class or was treated differently than a similarly situated, non-protected employee. (Doc # 17, Pg. 18) Hughes argues that employees Nigro, Rapaski, and Julia Ostrowski were treated differently than her. Hughes fails to mention that Cunningham, the employee most similar to her, was also abruptly fired. In addition, Rapaski, who was also involved in the events that led to Hughes's termination, was also fired without being allowed to participate in a progressive discipline policy. Based on the facts presented, Hughes cannot establish a *prima facie* case for racial discrimination because the two Caucasian women most similar to Hughes were also fired without being allowed to transition through an HFHS progressive discipline process.

Even if the Court proceeds under the assumption that Hughes has established a *prima facie* case, shifting the burden, Defendants have provided sufficient evidence to support their contention that bad customer service and poor treatment of co-workers were the reasons for discharging Hughes. Those are legitimate, nondiscriminatory reasons. Hughes must then be able to prove, by a preponderance of the evidence, that the legitimate reasons offered by the Defendants were pretext

for discriminating against her based on her race. Hughes may establish pretext by showing that Defendant's stated reasons: (1) have no basis in fact; (2) did not actually motivate her termination; or (3) were insufficient to warrant her termination. *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994). Hughes does not argue that her poor customer service and treatment of co-workers did not actually motivate her termination.

A court must "ask whether the plaintiff has produced evidence that casts doubt on the employer's explanation, and, if so, how strong it is." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n. 4 (6th Cir. 2009). The ultimate decision is whether the evidence of pretext, combined with the evidence establishing the plaintiff's *prima facie* case, would allow "the trier of fact to conclude that the employer unlawfully discriminated." *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147-48 (2000).

Hughes has not provided circumstantial evidence to cast doubt on Defendant's explanation for her termination. Cunningham, the worker who was most comparable to Hughes, was also abruptly terminated. Rapaski, the source of the alleged discrimination, was also abruptly fired.

Hughes has not presented evidence sufficient to raise a genuine issue of material fact that Defendant's decision to terminate her was mere pretext, and provided unpersuasive evidence to establish a *prima facie* case of discrimination.

Regarding Hughes's discrimination claims under Title VII and ELCRA, Summary judgment is **GRANTED**.

### 2. *Retaliation Claims*

Similar to discrimination claims, the Sixth Circuit reviews claims of retaliation brought under the ELCRA under the same standards as claims brought under Title VII. *Humenny v. Genex Corp.*, 390 F.3d 901, 906 (6th Cir. 2004). Retaliation claims supported by circumstantial evidence are examined using the *McDonnell Douglas* burden-shifting framework. A *prima facie* case of retaliation consists of four elements: (1) the plaintiff engaged in a protected activity under Title VII; (2) defendant knew of plaintiff's exercising of the right; (3) defendant took an adverse employment action against plaintiff or plaintiff was subjected to severe or pervasive retaliatory harassment by a supervisor; and (4) there was a causal connection between the protected activity and the adverse employment action or harassment. *Garner v. Cuyahoga Cnty. Juvenile Court*, 554 F.3d 624, 639 (6th Cir. 2009).

If plaintiff establishes a *prima facie* case, the burden shifts to the defendant to provide a "legitimate, nondiscriminatory reason for its action." *McDonnell Douglas*, 411 U.S. at 802. Once defendant has produced a legitimate reason, the burden shifts to plaintiff to demonstrate, by a preponderance of the evidence, that the proffered reason was a mere pretext for discrimination. *Abbott v. Crown Motor Co.*, 348 F.3d

537, 542 (6th Cir. 2003). In order to show pretext, plaintiff must establish that defendants stated reason (1) has no basis in fact; (2) did not actually motivate the adverse action; or (3) was insufficient to motivate the adverse action. *Id.*

Hughes asserts that her complaints about racial discrimination by Rapaski led to her termination and harassment. Defendant argues that Hughes has not provided any evidence that her claims of racial discrimination motivated the decision to terminate her employment, and cannot establish that her termination was pretext for racial discrimination. (Doc # 17, Pg. 18) The Court agrees with Defendant.

First, Hughes cannot establish a *prima facie* case of retaliation for harassment because there is not a casual connection between her EEOC claim for racial discrimination and her alleged harassment by Rapaski. Hughes's retaliation theory is based on conduct committed by Rapaski before Hughes filed her EEOC claim. There is no casual connection between the alleged harassment Hughes suffered from Rapaski and her claims of racial discrimination. Second, regarding her termination, Hughes cannot establish that the stated reasons for her termination were pretext for discrimination. Similar to the analysis above, Hughes has not provided evidence to cast doubt on HFHS's explanation for her termination. Cunningham and Rapaski, both white women, were abruptly fired for reasons similar to Hughes.

Regarding Hughes's retaliation claims under Title VII and ELCRA, Summary judgment is **GRANTED**.

## D. FMLA Claims (Count V)

The Sixth Circuit recognizes "two distinct theories for recovery under the FMLA: (1) the 'entitlement' or 'interference' theory arising from 29 U.S.C. § 2615(a)(1); and (2) the 'retaliation' or 'discrimination' theory arising from 29 U.S.C. § 2615(a)(2)." *Hoge v. Honda of America Mfg., Inc.,* 384 F.3d 238, 244 (6th Cir.2004). "A plaintiff can prove an FMLA retaliation claim using direct or circumstantial evidence." *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 897 (6th Cir. 2016).

### 1. *Interference Claim*

Hughes alleges that HFHS interfered with her valid attempt to take FMLA leave on August 4, 1016 by denying her request. (Doc # 1, Pg. 13, ¶ 74–74) Defendant argues that Hughes requested FMLA leave for a doctor's appointment, but her medical records show no appointment that day, and there is no other indication that Hughes required leave that day other than a request for combined time off (CTO), which Hughes later retracted. (Doc # 17, Pg. 7). HFHS presents no other arguments regarding Hughes's FMLA interference claim. An employee must give her employer sufficient notice of her intention to use family medical leave whenever possible. 29 C.F.R. § 825.302(a); *Killian v. Yorozu Auto. Tennessee, Inc.*, 454 F.3d 549, 554 (6th Cir. 2006). The notice "need not expressly assert rights under the FMLA . . . ." 29 C.F.R. § 825.302(c). "[A]n employer may delay the taking of

FMLA leave to an employee who fails to provide timely certification after being requested by the employer to furnish such certification…, until the required certification is provided." 29 C.F.R. § 825.311(a). Based on the facts presented, HFHS's policies on FMLA leave are not clear. The facts surrounding the request or the denial of leave have not been provided by either party. With respect to Hughes's FMLA interference claim, summary judgment is **DENIED**.

### 2. *Retaliation Claims*

Under the FMLA, "[i]t shall be unlawful for any employer to discharge or in any other manner discriminate against an individual for opposing any practice made unlawful by [the FMLA]." *Edgar v. JAC Prods., Inc.,* 443 F.3d 501, 508 (6th Cir.2006). For an FLMA claim based on direct evidence, "that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions"—a plaintiff may not proceed under the *McDonnell Douglas* analysis used for claims brought using circumstantial evidence. *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008) (quoting *DiCarlo v. Potter,* 358 F.3d 408, 415 (6th Cir.2004)).

Hughes makes two retaliation arguments. One argument is based on the alleged harassment Hughes suffered from Rapaski's treatment. The other is based on Hughes's termination. Hughes contends that she has direct evidence to prove her retaliation claims, and, if not, circumstantial evidence.

In order to present direct evidence of retaliation, a plaintiff must provide evidence that (1) the plaintiff's employer was predisposed to discriminate on the basis of [the FMLA], and (2) the employer acted on that predisposition. *Daugherty*, 544 F.3d at 707. If a plaintiff is successful, the plaintiff does not have the burden of disproving the validity of defendant's legitimate nonretaliatory reasons for the adverse action. *Id.* The burden shifts to the defendant to prove, by a preponderance of the evidence, it would have made the same decision absent the discriminatory motive. *Id.* Hughes merely states that HFHS is predisposed to discriminate on the basis of the FMLA, and does not provide any facts to support its contention. Accordingly, the Court proceeds under the familiar burden shifting framework applied to claims brought using circumstantial evidence.

To establish a case of retaliation under the FMLA, a plaintiff must show, "(1) he or she engaged in an activity protected by the FMLA; (2) the employer knew that he or she was exercising FMLA rights; (3) he or she suffered an adverse employment action; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action." *Ferrari*, 826 F.3d at 897. The burden then shifts to the defendant to provide a legitimate, non-discriminatory reason for the plaintiff's adverse treatment. *Algie v. N. Kentucky Univ.*, No. CIV.A. 08-109-DLB, 2013 WL 624396, at *6 (E.D. Ky. Feb. 20, 2013). Once the defendant demonstrates a legitimate nonretaliatory reason, the plaintiff must show that the nondiscriminatory

reason is pretext. *Id.* Hughes primarily relies on her interactions and treatment from Rapaski to support her FMLA retaliation claims.

On the issue of termination, the Court finds that Hughes cannot establish a *prima facie* case for retaliation because there is not a causal connection to Hughes's FMLA requests and the decision to terminate her employment. The stated reasons for her termination did not reference her absence or tardiness from work. In addition, Rapaski was already fired by HFHS when Hughes was terminated. Hughes has not presented evidence that any other HFHS manager took issue with her FMLA leave. The termination was the result of numerous customer and co-worker complaints.

However, Hughes can establish a *prima facie* case for her harassment based FMLA retaliation claim. First, Hughes engaged in protected FMLA activity by taking leave several times while under the management of Rapaski. Second, Rapaski and other HFHS employees knew Hughes occasionally took FMLA leave. Third, Rapaski took adverse actions against Hughes by issuing her corrective actions, requiring her to attend SEAT, openly discussing her frustration with Hughes's FMLA leave with HFHS employees, and openly keeping a calendar to document Hughes's days off. Fourth, all those actions were taken by Rapaski, sometimes in direct response to Hughes exercising her rights under the FMLA.

HFHS does not respond directly to Hughes's harassment-based retaliation theory, but argues that Rapaski was terminated and adds that Hughes suffered some

adverse treatment due to her bad customer service and treatment of coworkers. HFHS has not provided any legitimate, non-retaliatory reason for the harassment Hughes alleges she suffered.

Hughes has presented evidence sufficient to raise genuine issues of material fact that she suffered retaliation in violation of the FMLA while working as an MA in HFHS's Macomb EHS department. Regarding Hughes's retaliation claim under the FMLA for harassment, Summary judgment is **DENIED**.

## III. CONCLUSION

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendant Henry Ford Health System's (HFHS) Motion for Summary Judgment on Plaintiff Valeriya Hughes's discrimination and retaliation claims under Title VII of the Civil Rights Act ("Title VII") and the Elliot-Larsen Civil Rights Act (ELCRA) (Counts I & II) is **GRANTED**.

**IT IS FURTHER ORDERED** that HFHS's Motion for Summary Judgment on Hughes's discrimination and retaliation claims under the American with Disabilities Act (ADA) (Count III) and the Michigan Persons with Disabilities Civil Rights Act (PWDCRA) (Count IV) is **GRANTED**.

**IT IS FURTHER ORDERED** that HFHS's Motion for Summary Judgment on Hughes's interference and retaliation claims under the Family and Medical Leave Act (FMLA) (Count V) is **DENIED**.

S/Denise Page Hood
Denise Page Hood
Chief Judge, United States District Court

Dated: August 17, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on August 17, 2018, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager